IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**MONICA ZEPEDA-MARQUEZ**,
   Petitioner,

v.

**COMMISSIONER OF SOCIAL SECURITY**,
   Defendant.

Civil No. 23-1617 (BJM)

## OPINION AND ORDER

Monica Zepeda-Marquez ("Zepeda-Marquez") seeks review of the Commissioner of the Social Security Administration's (the "Commissioner") finding that she is not entitled to benefits under the Social Security Act, 42 U.S.C. § 423. Zepeda-Marquez contends that the administrative law judge's ("ALJ") decision finding her not disabled is at odds with the evidence of her disability. Docket No. ("Dkt.") 14. The Commissioner opposed. Dkt. 19. The case is before me on consent of the parties. Dkt. 6.

For the following reasons, the Commissioner's decision is **AFFIRMED**.

## STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1 (the "Listings"), which the Commissioner

acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, through which the ALJ assesses the claimant's residual functional capacity and determines whether the impairments prevent the claimant from doing the work she has performed in the past.

An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If she cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of her residual functional capacity, as well as age, education, and work experience. If the claimant cannot, then she is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving she cannot return to her former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz*, 890 F.2d at 524. Additionally, to be eligible for disability benefits, the claimant must demonstrate that her disability existed prior to the expiration of her insured status, or her date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

**BACKGROUND**

**A. Medical History**

Zepeda-Marquez was born on April 16, 1974. Transcript ("Tr.") 38. She has a Bachelor's Degree in Actuarial Science and a Graduate Degree in Applied Statistics. Tr. 55. She spent roughly ten years working as an actuary at Mapfre, a Puerto Rico-based insurance company, where she

became a manager. Tr. 56; 1199-1200. After developing several ailments, she stopped working at Mapfre in early 2015. Tr. 56. She first applied for social security benefits on January 16, 2015, claiming a disability onset date of July 18, 2014. Tr. 990. However, her application was denied. Tr. 1007. She applied for benefits again on August 18, 2018, claiming the same initial onset date, which is the application currently under review. Tr. 23. Her date last insured is December 31, 2020. Tr. 24. Next is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the social security transcript.

*Treating Sources: Physical Limitations*

**Dr. Aixa Rivera Guasp**

Dr. Aixa Rivera Guasp, a rheumatologist, provided substantial treatment during the insured period. The record contains detailed progress notes from September 8, 2015 to January 28, 2022, thus covering most of the insured period. *See* Tr. 264-318; 592-693; 853-936; 1425-1480; 1798-1824. The initial progress note reports symptoms of tiredness, general malaise, poor sleep, conjunctivitis, hearing impairments, depression, and panic attacks. Tr. 592-93. It also indicates that she was diagnosed with rheumatoid arthritis in 2004 and with fibromyalgia in February 2015. Tr. 594. Her rheumatoid arthritis, treated with Humira medication, went into remission for several years before returning by 2015. *Id*. In January 2016, hand and wrist MRI exams found no evidence of active synovitis and attributed her joint pain to mild degenerative joint disease, likely related to her fibromyalgia. Tr. 601. In June 2016, she started yoga exercises to treat her joint pain. Tr. 609. Later that year, symptoms of dry mouth and eyes were reported and the possibility of Sjogrens' disease was investigated. Tr. 614. Her autoimmune thyroiditis is first noted in January 2017. Tr. 618. Elevated liver enzymes were also noted, and these fluctuated for the next year and a half. *Id*.; Tr. 626; 630. In November 2018, after neurology exams found white matter in her brain, she underwent further exams looking for possible multiple sclerosis ("MS"), but the results came back negative. Tr. 637, 642. In or around May 2019, she was admitted to El Panamericano PHP due to anxiety and panic attacks. Tr. 648. Further notes indicating, among other things, her neurological

re-evaluation in March 2021 finding no progression of white matter lesions, fall outside of the insured period. Tr. 668; 674.

Dr. Rivera Guasp's progress notes indicate that Zepeda-Marquez attested to generalized body pain and fatigue throughout the insured period. Tr. 592-665. Zepeda-Marquez also occasionally reported symptoms of headaches and depression. *See*, *e.g.*, *id.*; Tr. 632. Occasional flare-ups of bursitis were noted. Tr. 634; 660. However, the progress notes consistently report that Zepeda-Marquez was "[o]riented by person, place and time" and "walks without help." *See*, *e.g.*, Tr. 629; 659. Additionally, she was consistently "[without] active synovitis" throughout the insured period. Tr. 601-664.

**Dr. Patricia De Jesus Umpierre**

Dr. Patricia De Jesus Umpierre, a neurologist, first treated Zepeda-Marquez in November 2018. Tr. 377-381. Dr. De Jesus Umpierre flagged a possible diagnosis of MS due to MRI results which found white matter lesions in Zepeda-Marquez's brain. Tr. 522. However, subsequent analysis found no evidence of MS. Tr. 642. Dr. De Jesus Umpierre's initial progress note indicates that Zepeda-Marquez reported symptoms of blurred and narrowed vision, burning sensations in her head, numbness in her right arm, and burning sensations when moving her eyes. Tr. 381. She reported concentration problems and mood swings, as well as difficulty expressing her thoughts properly – for example, she said "I want to say bank, but I say a different word." *Id*. However, she was apparently alert and spoke fluently, an observation that was also found in later progress notes. Tr. 815; 931. Dr. De Jesus Umpierre's handwritten progress notes are generally illegible. *See*, *e.g.*, Tr. 436; 759.

**Dr. Lidia Garib Garcia**

Dr. Lidia Garib Garcia, a physiatrist, also provided treatment during the insured period. Dr. Garib Garcia submitted a Treating Source Statement on behalf of Zepeda-Marquez. *See* Tr. 238-257. However, the attached progress notes are generally illegible, and the DDS Neurological Medical Report form was left blank. Tr. 240-244; 249-257. What appears to be an attached initial patient assessment form, dated March 2015, reports symptoms of joint pain, burning sensations in

soles, and spasms. Tr. 238. Several reports from treatments referred by Dr. Garib Garcia to Hospital HIMA-San Pablo, dated July 2018, are also attached to the Treating Source Statement. To the extent they are understandable from a lay perspective, they appear to indicate that Zepeda-Marquez's spine and joints were not abnormal. Tr. 245-248.

Dr. Garib Garcia also conducted electromyogram and nerve conduction (EMG/NCS) studies on December 18, 2018. These tests revealed overimposed bilateral median nerve entrapment at her wrists. Tr. 1824. This led Dr. Garib Garcia to diagnose Zepeda-Marquez with carpal tunnel syndrome. *Id*. These same studies revealed no evidence of lumbosacral radiculopathy in Zepeda-Marquez's spine. *Id*.

### Dr. Yolanda Mas De Leon

Dr. Yolanda Mas De Leon apparently served as Zepeda-Marquez's primary care physician during the insured period. Tr. 85; 377. However, there is limited legible medical evidence on file from Dr. Mas De Leon. *See* Tr. 383-422. Sporadic progress notes, dating between 2015 and late 2018, indicate that Zepeda-Marquez reported symptoms of body aches, vision loss, joint pain, backache, muscle weakness, anxiety, and depression. Tr. 400; 413; 415; 421. However, the same progress notes report no headaches, dizziness, nervousness, loss of memory, or disorientation. *Id*.

### Dr. Federico Rodriguez Perez

Dr. Federico Rodriguez Perez, a gastroenterologist, prepared a Consultation Report for Zepeda Marquez dated April 19, 2017, along with several follow-up reports from 2017 to 2018. Tr. 1501-1511; 1738-1769. Dr. Rodriguez Perez analyzed Zepeda-Marquez's abnormal liver enzymes and diagnosed fatty liver. Tr. 1506-1507. He recommended treating this condition with diet and exercise. *Id*. Follow-up visits diagnosed a severe case of gastro-esophageal reflux, for which Dr. Rodriguez Perez performed an EGD exam and referred Zepeda-Marquez for chemistry tests. Tr. 1510-1511. The EGD exam led to diagnoses of gastritis and esophagitis, which Dr. Rodriguez Perez planned to treat with zantac, protonix, and an irritant-free diet. Tr. 1745-1746. To

the extent the chemistry results are understandable from a lay perspective, they appear to indicate results within expected ranges, with occasional exceptions. Tr. 1512-1527; 1747-1768.

### Dr. Carlos Figueroa-Nunez

Dr. Carlos Figueroa-Nunez's treatment records are found at Tr. 1653-1661, 2073-2090, and 2366-2383. Apart from one progress note dated November 13, 2020 (Tr. 2079-2080), his records are either outside of the insured period or illegible. The November 13, 2020 progress note reports no muscle or joint pain and no limitation of range of motion. Tr. 2080. It also appears to flag two categories of chemistry results that came back outside the normal ranges. *Id*. In terms of plan, it recommends a nutritionist evaluation, Synthroid medication, diet and exercise, a gastro evaluation, and notes a follow-up appointment in four months. *Id*.

### Dr. Julio Rodriguez

Dr. Julio Rodriguez, an ophthalmologist, examined Zepeda-Marquez from December 2018 through the end of the insured period. Tr. 479. Zepeda-Marquez reported symptoms of intermittent ocular pain, numbness in her face and right arm, nausea, dizziness, loss of coordination, and difficulty speaking, but Dr. Rodriguez notes that she was not hospitalized for these symptoms. Tr. 1859. Dr. Rodriguez's progress notes say that Zepeda-Marquez did not have any ophthalmological manifestations of MS. *Id*. They also indicate that her vision was 20/30 in 2018 and early 2019, but apparently improved to 20/20 by late 2019. Tr. 480.

### Dr. Enrique Rodriguez Olaverr

Dr. Enrique Rodriguez Olaverr performed an MRI exam on Zepeda-Marquez and provided notes dated September 1, 2018. Tr. 258-263; 1528-1533. Dr. Rodriguez Olaverr's notes report the presence of white matter lesions in Zepeda-Marquez's brain. Tr. 262. Otherwise, his notes are either illegible or not understandable from a lay perspective.

### Dr. Jesus Alberto Maldonado

Dr. Jesus Alberto Maldonado provided a physical Consultative Examination on March 4, 2019. Tr. 1781-1788. Dr. Maldonado noted that Zepeda-Marquez had tenderness in her arms, legs, and joints, and that her gait was antalgic and that she walked with a limp. Tr. 1783; 1785. However,

he also noted that she had full strength in both hands, was coordinated in the four extremities, and did not have joint swelling. *Id*. He also noted that she was alert, cooperative, and oriented during the exam. *Id*. He diagnosed motorsensory polyneuropathy, cervico dorsal and lumbar pain, and bilateral carpal tunnel syndrome. Tr. 1784.

### Dr. Vincente Sanchez

Dr. Vincente Sanchez, a state agency medical consultant, provided a physical disability opinion on March 18, 2019 after performing a telephone interview. Tr. 1020-22. Dr. Sanchez noted that Zepeda-Marquez's symptoms were "credible and could be attributed to the documented [medically determinable impairments]." Tr. 1022. However, he concluded that the "allege[d] effect on functionality could be expected to some degree, but not to the exten[t] alleged." *Id*. As a result, her conditions did not medically equal any listing and she maintained residual functional capacity for light work. *Id*.; Tr. 1029. Overall, Dr. Sanchez's assessment found Zepeda-Marquez not disabled by her physical limitations. Tr. 1030.

### Dr. Jose Gonzalez-Mendez

Dr. Jose Gonzalez-Mendez, a state agency non-examining medical consultant, provided a physical disability opinion on June 11, 2020. Tr. 1040-50. Dr. Gonzalez-Mendez found no new allegations or alleged worsening of symptoms since the first assessment by Dr. Sanchez. Tr. 1046. He found the first assessment well-supported and affirmed its finding that Zepeda-Marquez maintained residual functional capacity for light work and was not disabled by her physical limitations. *Id*.

*Treating Sources: Mental Limitations*

### Dr. Diogenes Adames Roa

Dr. Diogenes Adames Roa served as Zepeda-Marquez's psychiatrist through the entire insured period (and both before and after). Tr. 180-221; 451-457; 694-746. The record contains progress notes dating from March 2012 (his initial evaluation) up to December 2021. *Id*. Dr. Adames consistently found her to have psychomotor agitation, labile affect, anguished mood, self-deprecation, hopelessness, decreased attention, decreased concentration, limited abstraction, and

poor or impaired judgment. *Id*. After mid-2019, he also consistently noted that she had impaired immediate memory. Tr. 453-454; 738-746. He diagnosed major depression and consistently gave low GAF scores, initially around 60 (Tr. 210), falling to 40 in 2019 (Tr. 738) before bottoming out at 35 at the end of the insured period (Tr. 742). However, he consistently noted that she had good hygiene, was cooperative during appointments, spoke coherently and logically, had alert consciousness, had intact recent and remote memory, and had adequate orientation, awareness, impulse control, and intellect. Tr. 180-221; 451-457; 694-746.

Dr. Adames also provided a Medical Source Statement, dated March 15, 2022,[1] in connection with Zepeda-Marquez's application for benefits. *See* Tr. 694-695. He indicated that her ability to understand, remember, and carry out instructions was impaired. *Id*. Specifically, her ability to understand, remember, and carry out short and simple instructions was moderately impaired, and her ability to understand, remember, and carry out detailed instructions was markedly impaired. *Id*. Additionally, her ability to make judgments on simple work-related decisions was markedly impaired. *Id*. Dr. Adames stated that her ability to interact appropriately with the public was markedly impaired, and ability to interact appropriately with supervisors and co-workers was extremely impaired. *Id*. Her ability to respond appropriately to work pressures and changes in routine were also extremely impaired. *Id*. Dr. Adames noted that she "doesn't tolerate minimum stress," has "poor memory; poor retention," and that her fatigue and psychomotor retardation "[h]inder her ability to perform any activities requiring attention, concentration, time limit, or initiative." *Id*. Dr. Adames also opined that she could not manage benefits in her own best interest. *Id*.

**Dr. Sheika M. Morales Ortiz**

Zepeda-Marquez was treated by Dr. Sheika Morales Ortiz, a clinical psychologist, following a referral by San Juan Capestrano PHP in 2019. Tr. 463. The record contains progress notes dating from May 31, 2019 to September 16, 2021. Tr. 459-464; 974-978. These notes indicate

---

[1] While outside of the insured period, the ALJ did not mention this as a reason why she chose to give his opinions limited weight. *See* Tr. 38.

chronic stressors for Zepeda-Marquez, such as childhood trauma and mourning over deceased family members. *See*, *e.g.*, Tr. 460. They also note her symptoms of sadness and dejection, while also noting that she was not suicidal or homicidal. Tr. 463.

**Dr. Jose L. Correa Falcon**

Dr. Jose Correa Falcon, a clinical psychologist, performed a psychological Consultative Examination on February 25, 2019 upon referral from the Social Security Administration. Tr. 439-49. Dr. Correa Falcon noted that Zepeda-Marquez was adequately dressed, cooperative, and made complete eye contact during the assessment. Tr. 443. Her mood was sad and depressed, but her speech was coherent and her thoughts organized. Tr. 444. Her orientation in place and time was accurate. *Id*. Her performance on memory tests was inconsistent, with her short-term memory showing signs of impairment but her long-term memory being largely intact. Tr. 445. Her "focus and concentration levels were variable." *Id*. Intellectual ability questions testing general knowledge, interpretation, arithmetic, and social judgment were generally answered correctly. Tr. 446-47. Dr. Correa Falcon concluded that Zepeda-Marquez showed depression symptoms consistent with Major Depressive Disorder but found that she was competent to handle her funds. Tr. 447.

**Dr. Jeannette Maldonado**

Dr. Jeannette Maldonado, a state agency medical consultant, provided a mental disability opinion on February 28, 2019. Tr. 1026-28. Dr. Maldonado noted that Zepeda-Marquez's "main functional complaints are pain related" and that she had not "been [] hospitalized due to her depression or anxiety." Tr. 1028.[2] She noted that Zepeda-Marquez faced moderate limitations in ability to remember work procedures, concentration and persistence, and maintaining regular attendance. Tr. 1027. Dr. Maldonado appears to have spoken with Zepeda-Marquez over the phone

---

[2] The record indicates that Zepeda-Marquez was "partially hospitalized" at El Panamerico PHP, and later at San Juan Capestrano PHP (both in Humacao, Puerto Rico) following a severe bout of anxiety and panic attacks in 2019. Tr. 463; 648. Her partial hospitalization is first noted on the May 2019 progress note from Dr. Rivera Guasp, and is not noted the preceding progress note from February 15th. Tr. 642; 648. It thus appears likely that her partial hospitalization occurred after Dr. Maldonado prepared her report.

and claimed that "no concentration deficit was detected." *Id*. She found that her adaptation limitations were generally not significant and concluded that she maintained residual functional capacity for simple tasks, including maintaining concentration for at least two hours. Tr. 1027-29. Overall, Dr. Maldonado concluded that Zepeda-Marquez was not disabled by her mental limitations. Tr. 1030.

### Dr. Annette De Paz-Ortiz

Dr. Annette De Paz-Ortiz, a state agency non-examining medical consultant, provided a mental disability opinion at the redetermination phase of the Commissioner's review on June 10, 2020. Tr. 1046-49. Dr. De Paz-Ortiz endorsed the prior assessment from Dr. Maldonado, stating that there was no evidence that Zepeda-Marquez's symptoms were worsening. Tr. 1048. Dr. De Paz-Ortiz thus concluded that she was not disabled by her mental limitations. *Id*.

## B. Procedural History

Zepeda-Marquez's application was reviewed by ALJ Livia Morales, who held a hearing on May 2, 2022. Tr. 50-75. During the hearing, Zepeda-Marquez testified about her living conditions, noting that she no longer drives herself places because she frequently gets lost. Tr. 54-55. Her partner drives her most places. *Id*. As to her work history, Zepeda-Marquez testified that, prior to 2015, she worked long hours as an actuary for Mapfre. Tr. 57. Her job consisted of office work with limited standing, walking, or carrying heavy objects throughout the day. *Id*. She was forced to stop working in 2015 because of her intensifying health conditions. Tr. 57-58.

Zepeda-Marquez testified in detail about how her health conditions affect her day-to-day life. With respect to her rheumatoid arthritis, the condition causes pain in her shoulders, hands, knees, and ankles, causing them to "feel like they're going to break." Tr. 59. Her arthritis is "activated very often" and is aggravated by stress and menstruation. *Id*. She claimed that, at times, the pain lasts continuously for eight months, and its intensity would make her cry. *Id*. Even when not as severe, the pain would not completely go away. *Id*. She asserts that her headaches, sensitivity to light and sound, and pain in her eyes are caused by lesions that formed in her brain after taking Humira for ten years to treat her rheumatoid arthritis. *Id*. She reported that ocular pain and

sensitivity to light would prevent her from looking at a computer monitor for any longer than an hour. Tr. 60. She claims to suffer from headaches at a rate of between three and eight per month, with each headache requiring her to lie down for two to three hours to wait out the pain (with the help of pain medication). Tr. 61-62. Her headaches also make her nauseous. *Id*. Zepeda-Marquez testified that, while somewhat similar to rheumatoid arthritis, her fibromyalgia does not affect her joints, and leads to swelling and stiffness in the afternoon rather than the morning. Tr. 63. This pain would induce a variety of side effects, such as diarrhea, constipation, and hunger. *Id*. Her fibromyalgia symptoms are most acute when she is "very stressed" and are more continuous than her other sources of pain. Tr. 64. Zepeda-Marquez also testified that her conditions of hypothyroidism and dermatitis were being controlled with medication. Tr. 65. She spoke of her depression and how it is triggered by the confluence of her physical conditions, expressing frustration with her lack of ability to "do anything" and how "everything hurts." *Id*. Last, she spoke about her inability to concentrate – her mind "goes blank," and she cannot concentrate sufficiently to make coffee for herself or run simple errands. Tr. 67.

Next, Luisa Suess, vocational expert ("VE") for the Social Security Administration, was questioned by the ALJ. VE Suess first testified that a claimant limited to light work, simple and routine tasks, with judgment and ability to adapt to changes in the environment limited to simple, work-related decisions could not perform Zepeda-Marquez's previous job. Tr. 69. However, VE Suess testified that other jobs, requiring light exertion and low skill level, could be performed and existed in sufficient numbers in the national economy. Tr. 70-72. The ALJ asked if the same jobs could be performed by someone off-task more than 10% of the day because of pain symptoms and concentration, and VE Suess testified that they could not be performed. Tr. 72. The most such a person could be off-task and still perform those jobs was 10%, with a maximum absence of one day per month. *Id*. Zepeda-Marquez's attorney asked whether someone with her conditions who could only occasionally maintain attention and concentration could do any of the jobs VE Suess provided, and VE Suess answered that such a person could not. Tr. 72-73.

The ALJ issued her opinion on July 14, 2022. Tr. 23-40. The ALJ found that Zepeda-Marquez 1) had not engaged in any substantial gainful activity since the disability onset date (July 18, 2014), 2) had severe impairments of rheumatoid arthritis, fibromyalgia, and major depressive disorder, 3) did not have a condition that met the severity of one of the Listings, 4) could not return to her former employment, and 5) maintained a residual functional capacity to perform simple, sedentary work. *Id*. Her myalgia & myositis, hypothyroidism, pre-diabetes mellitus, autoimmune thyroiditis, inflammatory liver disease, fatty liver, gastritis, and headaches were each deemed non-severe. Tr. 26. The ALJ found that her severe conditions did not meet their corresponding Listings – 11.14(a) (peripheral neuropathy), 14.09 (inflammatory arthritis), and 12.04 (depressive, bipolar and related disorders). Tr. 26-30. With respect to her physical health conditions, the ALJ concluded that she preserved capacity for light work, pointing to evidence that she "preserved full strength in all major muscle groups, normal reflexes, no neurological deficits, normal manipulative ability in the bilateral hands, no swelling of joints, normal coordination in all extremities, no motor weakness, and no significant muscle atrophy." Tr. 33. The ALJ also concluded that her "range of motion in all major joints was mostly within normal limits." *Id*. With respect to her mental health conditions, the ALJ noted that "her concentration was considered variable" but nonetheless concluded that she "preserved fairly normal levels of cognition, recall, ability to pay attention, and persistence." Tr. 34. She also noted that Zepeda-Marquez was cooperative in interviews, gave complete eye contact, and established good rapport in examinations. Tr. 35.

In arriving at her conclusions, the ALJ considered the state agency medical sources' opinions (Dr. Sanchez, Dr. Gonzalez-Mendez, Dr. Maldonado, and Dr. De Paz-Ortiz) persuasive. Tr. 36-37. The ALJ noted that their opinions were supported by the overall evidence in the record. *Id*. However, the ALJ found that Zepeda-Marquez had a higher degree of impairment than the state agency sources found. For her physical limitations, this was due to the combination of impairments, and for her mental limitations, evidence obtained after the opinions were issued suggested a higher degree of impairment. *Id*. The ALJ similarly found Dr. Correa Falcon's opinion persuasive, since it was consistent with the severity of conditions described in the medical record.

Tr. 37-38. By contrast, the ALJ considered Dr. Diogenes Adames's Medical Source Statement unpersuasive. The ALJ reasoned that Dr. Adames's assessment of marked and/or extreme mental limitations was inconsistent with the evidence on the record, which showed more moderate limitations. Tr. 38. The ALJ cited progress notes from Dr. Adames himself, Dr. Mas De Leon, and Dr. De Jesus Umpierre to show that Zepeda-Marquez was "cooperative, had normal hygiene and grooming, had intact memory, no perceptual disturbances, normal cognition, and normal insight and judgment," concluding that these conflicted with Dr. Adames's Medical Source Statement. *Id*.

After finding that she possessed residual functional capacity for light, unskilled work, the ALJ concluded that Zepeda-Marquez was not disabled during the insured period. Tr. 40. The Appeals Council denied review, Tr. 1, and this action followed.

## DISCUSSION

Zepeda-Marquez presents a series of arguments attempting to refute the validity of the ALJ's determination. However, few of these are properly developed. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). Thus, I will address only those issues that Zepeda-Marquez develops with some argumentation.

Zepeda-Marquez's first such argument is that the ALJ failed to address all of her health conditions as well as their combined effects. Dkt. 14 at 8. However, Zepeda-Marquez does not point to a single condition for which there was evidence on the record and that the ALJ disregarded when determining which conditions were severe. *Compare* Tr. 26 (finding severe conditions of rheumatoid arthritis, fibromyalgia, carpal tunnel syndrome, and major depressive disorder, while finding her myalgia and myositis, hypothyroidism, pre-diabetes mellitus, autoimmune thyroiditis, inflammatory liver disease, fatty liver, gastritis, and headaches non-severe), *with* Dkt. 14 at 2-6. Further, the ALJ explicitly referred to the combined effects of Zepeda-Marquez's conditions in connection with her residual functional capacity analysis. She first makes note of combined effects when finding certain conditions non-severe. Tr. 24 ("I note that those conditions have been

considered, and the reduced range of light work, as described below, would accommodate any symptoms associated with those conditions."). Next, after concluding that her major depressive disorder did not meet listing 12.04, ALJ Morales noted that the "residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis." Tr. 30. The ALJ also specifically noted that she considered Zepeda-Marquez's physical limitations more severe than determined by the state agency medical consultants due to their combined effects. Tr. 36. Rather than indicating failure to consider the combined effect of Zepeda-Marquez's symptoms, the ALJ's opinion instead demonstrates that combined effects were consistently considered throughout her review.

Zepeda-Marquez's second argument is that the ALJ found certain conditions to be non-severe, even though they have a listing, and that the ALJ erred by classifying her hypothyroidism as non-severe. Dkt. 14 at 9. However, just because a condition has a listing does not mean that the condition as experienced by the claimant is severe. In this case, the ALJ concluded that Zepeda-Marquez's myalgia and myositis, hypothyroidism, pre-diabetes mellitus, autoimmune thyroiditis, inflammatory liver disease, fatty liver, gastritis, and headaches were all non-severe. Tr. 26. The ALJ based these conclusions on the fact that there was no "evidence that they cause more than a minimal effect on the claimant's residual functional capacity," particularly that "there is no evidence of aggressive medical treatment, frequent hospital confinement, frequent emergency room visits, or surgical intervention for these conditions." *Id*. The ALJ noted that Zepeda-Marquez's headaches were not a "primary headache disorder" since other diagnoses could reasonably be expected to be the underlying cause (such as fibromyalgia). *Id*. With respect to her hypothyroidism, Zepeda-Marquez herself testified that this condition was being controlled with medication. *See* Tr. 65. All told, the ALJ did not err in finding these conditions non-severe.

Last, Zepeda-Marquez asserts that the ALJ "applied an erroneous legal standard as to evidentiary weight and credibility" and "substituted [her] own opinion for that [of] well-grounded medical evidence on record," rendering her residual functional capacity analysis "incomplete."

Dkt. 14 at 9. Zepeda-Marquez does not provide specific ways in which the ALJ erred in this regard, and I see no reversible issue with the ALJ's weighing of the evidence from the different medical sources. The only source that the ALJ found unpersuasive was Dr. Adames, Zepeda-Marquez's treating psychiatrist. For claims filed after March 27, 2017,[3] an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a). "An ALJ's decision to accord a treating physician's opinion with little weight will be sustained on review so long as one of the reasons given by the ALJ is proper and adequately supported." *Johnson v. O'Malley*, No. 4:23-cv-40094-MRG, 2024 U.S. Dist. LEXIS 160463, 2024 WL 4111009, at *22 (D. Mass. Sept. 6, 2024) (citation omitted). The ALJ found Dr. Adames's Medical Source Statement unpersuasive because his findings were "inconsistent with the overall evidence of record, which are more in line with moderate, and not marked or extreme mental limitations." Tr. 38. The ALJ pointed to evidence in the record (some of which was from Dr. Adames's own progress notes) showing that "she was cooperative, had normal hygiene and grooming, had intact memory, no perceptual disturbances, normal cognition, and normal insight and judgment." *Id.*[4] Further, the state agency medical consultants, Dr. Jeannette Maldonado and Dr. Annette De Paz-Ortiz, found that she could "perform simple tasks within the weekly demands of pace [and] concentration for at least two hours" and concluded that she maintained residual

---

[3] While Zepeda-Marquez's first claim was filed in January 2015, her current claim appears to have been filed in August 2018. Tr. 23; 73; 990. She does not argue that the pre-2017 "treating physician rule" under 20 C.F.R. § 404.1520c should be applied to opinions from Dr. Adames.

[4] Some of the evidence cited by the ALJ does not support the point she articulates. For instance, Dr. Adames's progress notes consistently record that Zepeda-Marquez had poor or impaired judgment, and after May 2019, impaired immediate memory. *See* Tr. 182-210; 452-457; 696-742. The ALJ also cites progress notes from Dr. De Jesus Umpierre containing blank check-boxes and illegible handwritten notes. *See* Tr. 438, 502, 510, 523, 533, 556, 759, 763, 792, 930, 940. It appears the ALJ cited these with the understanding that the blank check boxes represent absence of the listed symptoms. This conclusion is dubious, as there is no indication that the check boxes were being used to report symptoms on these forms. However, since other evidence cited by the ALJ and elsewhere in the record supports her conclusion, the error is harmless.

functional capacity for simple tasks. Tr. 1027-1028; 1048. Dr. Maldonado further noted that she did not detect any concentration limitations during her telephone interview, which contradicts observations made by Dr. Adames. Tr. 1027. "[I]t is not for the Court to second-guess the ALJ's findings, as long as those findings are supported by substantial evidence." *Johnson*, 2024 U.S. Dist. LEXIS 160463 at *27. The ALJ had adequate reason to find Dr. Adames's Medical Source Statement unpersuasive.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 23rd day of October, 2024.

                                              **S/Bruce J. McGiverin**
                                              BRUCE J. McGIVERIN
                                              United States Magistrate Judge